# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF GEORGIA

## COLUMBUS DIVISION

CRYSTAL WHITMAN,
*Plaintiff, Pro Se,*

v.

NEXSTAR MEDIA GROUP, INC.,
a Delaware Corporation, and

CONNOR HACKLING,

*Defendants.*

Civil Action No. 4: 25-cv-466(CDL)

## COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

## JURY TRIAL DEMANDED

COMES NOW Plaintiff Crystal Whitman, appearing *pro se*, and for her Complaint against Defendants Nexstar Media Group, Inc. and Connor Hackling, states as follows:

## PRELIMINARY STATEMENT

1. This case exposes a textbook example of racial discrimination in corporate America. For twenty-five years, Plaintiff Crystal Whitman built a distinguished career in broadcast media and news. During her four years at WRBL-TV under News Director Connor Hackling, Plaintiff—an African American woman—earned consistently strong performance reviews and maintained a flawless disciplinary record. Yet when her contract was approaching expiration and she sought to advance her career, Hackling systematically destroyed her professional opportunities through a campaign of lies, defamation, and obstruction that he never directed at similarly situated white employees.

2. The contrast could not be starker: Blake Eason, a white male anchor who was the subject of a harassment complaint that resulted in HR involvement, received favorable

references from Hackling, an easy transfer to another station, and a celebratory farewell broadcast. Plaintiff, whose record was spotless, received defamatory statements to prospective employers—with Hackling stating on a recorded call that she "does her own thing" and that he "would not recommend hiring her," while her agent reported that hiring managers were told she was "lazy" and "toxic." Plaintiff also had every single internal transfer request denied and received not even the basic professional courtesy of acknowledgment upon her departure.

3. The evidence against Defendants is devastating and irrefutable. Plaintiff possesses an audio recording of Defendant Hackling that confirms the defamatory statements reported by her agent, which her agent confirmed matched what he was told by both external and internal hiring managers. On this recording, Hackling himself admits that he received calls from other news directors as well—revealing that his campaign of defamation extended even further than originally documented. In November 2025, Nexstar's Legal Department, through Terry Bush, was provided portions of this recording. Despite hearing direct, undeniable evidence of Hackling's misconduct, Nexstar offered only a nominal resolution that failed to address the substantial harm caused by the discrimination.

4. When Plaintiff reported Hackling's misconduct—including his invasive demands that she disclose intimate details about a private medical procedure—Nexstar's Human Resources representative Mina Mayorga conducted an investigation but refused to address the text message evidence showing Hackling pressuring Plaintiff to disclose her doctor's name and contact information. Instead, HR fabricated a nonexistent company policy to justify Hackling's behavior, and Nexstar attempted to retaliate against Plaintiff through a baseless payroll dispute. The message was unmistakable: at Nexstar, white employees are protected and promoted, while Black employees are defamed and discarded.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).

Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981.

6. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because such claims are so related to the federal claims that they form part of the same case or controversy.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred at WRBL-TV in Columbus, Georgia, which is located within the Middle District of Georgia, Columbus Division.

8. The amount in controversy exceeds $75,000, exclusive of interest and costs.

9. Plaintiff has exhausted her administrative remedies as required by Title VII. Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), Charge No. 410-2025-09700. On September 16, 2025, the EEOC issued Plaintiff a Determination and Notice of Rights (Right to Sue letter), authorizing Plaintiff to file suit in federal court. A true and correct copy of the EEOC Right to Sue letter is attached hereto as Exhibit A and incorporated herein by reference. This Complaint is filed within ninety (90) days of Plaintiff's receipt of the Right to Sue letter.

## PARTIES

10. Plaintiff Crystal Whitman is an African American female citizen of the United States and a resident of Muscogee County, Georgia. Plaintiff is a twenty-five year veteran of the broadcast media and news industry. Plaintiff was employed by Defendant Nexstar Media Group, Inc. as an on-air news anchor at WRBL-TV in Columbus, Georgia from approximately May 2021 until June 2025.

11. Defendant Nexstar Media Group, Inc. ("Nexstar") is a Delaware corporation with its principal place of business at 545 E. John Carpenter Freeway, Suite 700, Irving, Texas 75062. Nexstar is an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b),

employing more than fifteen employees. Nexstar owns and operates WRBL-TV, the CBS affiliate in Columbus, Georgia, where Plaintiff was employed.

12. Defendant Connor Hackling is a white male who currently resides at 1430 East Victory Drive, Savannah, Georgia 31404, and is employed at WSAV-TV in Savannah. At all times relevant to this Complaint, Hackling served as News Director of WRBL-TV in Columbus, Georgia until approximately February 2025. Hackling was Plaintiff's primary supervisor for the majority of her tenure at WRBL, exercising authority over her work assignments, performance evaluations, internal transfer approvals, and employment references provided to external parties.

## STATEMENT OF FACTS

### A. Plaintiff's Distinguished Twenty-Five Year Career

13. Plaintiff has dedicated twenty-five years of her professional life to the broadcast media and news industry. Throughout her career, she has built a reputation for professionalism, reliability, and strong viewer ratings.

14. Plaintiff worked at WRBL-TV in Columbus, Georgia from approximately May 2021 until June 2025—a period of four years during which Connor Hackling served as her News Director for the majority of that time. Throughout this tenure, Plaintiff received consistently strong performance reviews and maintained an unblemished disciplinary record. Not once was Plaintiff subjected to any disciplinary action, written warning, or performance improvement plan.

15. Plaintiff's most recent contract with WRBL-TV was renewed in June 2024 and expired in June 2025. As her contract approached expiration, Plaintiff sought opportunities to advance her career. The contract renewal itself evidenced Nexstar's recognition of Plaintiff's value to the organization.

16. Plaintiff's performance reviews—authored by Defendant Hackling himself—praised her teamwork, reliability, professionalism, and willingness to support station operations. These reviews documented that Plaintiff volunteered to cover weekend shifts to address staffing needs, demonstrating her commitment to the station's success.

17. Plaintiff's proven ratings performance and strong regional following made her a valuable asset who generated significant interest from larger-market stations seeking to recruit her.

**B. The Stark Contrast: How Nexstar Treated a White Male Employee Versus an African American Woman with an Exemplary Record**

18. Upon information and belief, in or around 2021, Blake Eason, a white male morning co-anchor at WRBL-TV, sought to transfer to another Nexstar station. Prior to his departure, Eason was the subject of a harassment complaint filed by Plaintiff, which resulted in both Plaintiff and Eason being called to meet with Human Resources regarding his conduct toward her.

19. Despite this HR involvement, Nexstar management facilitated Eason's departure with full professional courtesies. He received favorable references from Hackling that made no mention of the HR matter. His transfer request was approved without obstruction. Management organized a farewell party in his honor. He received an on-air send-off broadcast with praise and well-wishes. He departed WRBL with his professional reputation intact and his career trajectory unimpeded.

20. The treatment Plaintiff received could not have been more different. Despite her exemplary service, flawless disciplinary record, and documented strong performance, Plaintiff received:

    a. Defamatory statements to prospective employers when they contacted Hackling about Plaintiff;

b. Denial of every single one of approximately twenty internal transfer requests;

c. Blocking of external job opportunities when prospective employers contacted Hackling;

d. No farewell party, no on-air acknowledgment, no professional courtesy of any kind upon her departure.

21. The only material difference between Eason and Plaintiff was race and gender. Eason is a white male who had been the subject of an HR complaint. Plaintiff is an African American woman with an exemplary record. Yet Hackling protected Eason's career and provided favorable references for him while destroying Plaintiff's opportunities.

22. This pattern of disparate treatment—favorable references and facilitated departures for white employees, defamation and obstruction for African American employees—demonstrates that race was a motivating factor in Defendants' treatment of Plaintiff.

**C. First Instance of Defamation: Hackling Destroys Plaintiff's Atlanta Opportunities (2022)**

23. In early 2022, Plaintiff retained talent agent Dana Adams to represent her in exploring larger-market opportunities as her contract period progressed.

24. Adams generated strong interest from hiring managers at Atlanta Alive and FOX 5 Atlanta—two major-market stations that would have represented significant career advancement. Both stations expressed serious interest in Plaintiff based on her credentials and discussed the possibility of executing a contract buyout to secure her services.

25. After both stations contacted Defendant Hackling for reference information, all communication abruptly ceased. The previously enthusiastic hiring managers went silent.

26. Agent Adams subsequently informed Plaintiff: "They were very interested, but after speaking with your News Director, they no longer want to move forward."

27. This was the first documented instance in which Defendant Hackling's communications to external employers destroyed Plaintiff's career opportunities. The pattern would continue and escalate.

**D. Medical Privacy Violation and Gender-Based Hostile Work Environment (Spring 2024)**

28. In March or April 2024, Plaintiff submitted a valid doctor's note excusing her absence from work for a medical procedure. The procedure was of a personal and intimate nature unique to women—a private health matter that Plaintiff reasonably expected would remain confidential.

29. Rather than accepting the legitimate medical documentation as any reasonable supervisor would, Defendant Hackling personally contacted Plaintiff and subjected her to an invasive interrogation. He demanded that she provide him with her doctor's name and contact information. He demanded specific details about her medical condition. He demanded information about the nature of the procedure she underwent.

30. Plaintiff was placed in an extremely uncomfortable and degrading position. As a female employee, she was being pressured by her male supervisor—a person with direct authority over her continued employment—to disclose intimate details about a gender-specific medical matter. The power imbalance was acute: Hackling controlled Plaintiff's performance reviews, transfer requests, and employment references.

31. Plaintiff feared retaliation if she refused to comply. Given Hackling's demonstrated pattern of obstructing her career, she had every reason to believe that refusing his demands would result in adverse consequences. Under duress, she provided the requested information via text message.

32. Hackling's conduct served no legitimate business purpose. A valid doctor's note was sufficient documentation for the absence. His demands for intimate medical details were gratuitous, invasive, and designed to humiliate and intimidate Plaintiff.

33. In May 2025, Plaintiff filed a formal complaint with Nexstar Human Resources and provided documentary evidence of Hackling's invasive demands—specifically, the text messages showing she had sent her doctor's name and telephone number to Hackling as he demanded and pressured her to do. HR representative Mina Mayorga received this evidence. Plaintiff was never informed of any follow-up investigation into this complaint or provided any acknowledgment that corrective action was taken.

**E. Systematic Denial of All Internal Transfer Requests (Fall 2024 – Spring 2025)**

34. From Fall 2024 through Spring 2025, Plaintiff submitted approximately twenty internal transfer requests to various Nexstar stations for open anchor and reporter positions. These were positions for which Plaintiff was qualified and which represented opportunities for career advancement within the company as her contract approached expiration.

35. Under Nexstar's internal transfer policy, approval from the current News Director is required before an employee can transfer to another station. This policy granted Defendant Hackling unilateral power to control—and destroy—Plaintiff's career advancement within the company.

36. Defendant Hackling denied every single one of Plaintiff's twenty transfer requests. He provided no written justification for any denial. He offered no explanation of what deficiency, if any, prevented Plaintiff from transferring.

37. During Plaintiff's career, internal transfers within Nexstar were routine and generally approved without issue. The sudden, blanket denial of all twenty requests under Hackling's supervision—without any change in Plaintiff's performance or qualifications—demonstrates discriminatory and retaliatory intent.

38. Recall that white male employee Blake Eason, despite the HR involvement in his case, had his transfer approved without obstacle. Plaintiff, with her spotless record, was blocked at every turn. Race was the determining factor.

**F. The Documented Defamation: Hackling's False Statements Exposed (Fall 2024 – Spring 2025)**

39. In Fall 2024, Plaintiff retained Agent Steve Koles to represent her in exploring new opportunities. Koles is a former Nexstar News Director with extensive industry contacts and longstanding professional relationships with hiring managers across multiple markets.

40. Koles generated strong initial interest from multiple stations, including Paul Caron, News Director at a station in South Carolina, and Bob Noonan, News Director at a station in Alabama. Both expressed significant enthusiasm about Plaintiff's credentials and experience.

41. The pattern repeated: each hiring manager withdrew interest shortly after contacting Defendant Hackling for reference information.

42. This time, however, Plaintiff obtained direct evidence of Hackling's defamation. When Koles followed up with hiring managers to understand why interest had suddenly evaporated, they disclosed the nature of statements Hackling had made. Agent Koles reported back to Plaintiff that hiring managers told him Plaintiff was described as "lazy" and "toxic."

43. Hackling's own written performance reviews contradicted these characterizations:

a. "Lazy" — Hackling's own written performance reviews praised Plaintiff's reliability and work ethic. She had no disciplinary history.

b. "Toxic" — Hackling's own reviews praised Plaintiff's teamwork and professionalism. No complaints had ever been filed against her.

c. Weekend shifts were voluntary — Hackling's reviews documented that Plaintiff volunteered for weekend coverage to support staffing needs and praised her for this flexibility.

44. Agent Koles confirmed that what he was told by hiring managers matched the information being provided by both external and internal sources within Nexstar.

45. In May 2025, Paul Caron, the South Carolina News Director, reviewed Plaintiff's actual performance reviews and recognized the truth. He apologized, stating: "After seeing your reviews, the picture painted by Connor doesn't match at all."

46. Caron's statement constitutes direct evidence that Hackling's statements to prospective employers were inconsistent with the documented record.

## G. The Smoking Gun: Audio Recording Confirms Hackling's Defamation

47. Plaintiff possesses an audio recording that provides direct evidence of Defendant Hackling's statements about her to prospective employers. On this recording, Hackling states that Plaintiff "does her own thing" and that he "would not recommend hiring her."

48. The recording confirms what Agent Koles reported—that Hackling was making negative statements about Plaintiff to anyone who inquired about her employment.

49. On this recording, Defendant Hackling himself admits that he received calls from other news directors as well. This admission reveals that Hackling's campaign against Plaintiff extended even further than originally documented—he was providing negative information about her to anyone in the industry who called.

50. The existence of this recording eliminates any dispute about what Hackling said. His statements are preserved in his own voice.

## H. Nexstar's Sham Investigation and Corporate Cover-Up (May – June 2025)

51. In May 2025, after discovering the documented pattern of defamation, Plaintiff issued a cease-and-desist letter addressed to Defendant Hackling and filed a formal complaint with Nexstar's corporate Human Resources department.

52. Nexstar HR, through representative Mina Mayorga, conducted an investigation into Plaintiff's complaints. During the investigation, Agent Steve Koles contacted Nexstar and confirmed the statements that had been reported to him by hiring managers.

53. During the investigation, on a call with HR representative Mina Mayorga, Nexstar offered a stunning justification for Hackling's conduct: "News Directors can have internal commentary and opinions about employees within Nexstar."

54. Terry Bush of Nexstar's Legal Department confirmed this purported policy. There was one problem: no such policy exists.

55. Nexstar's Employee Guidebook explicitly limits employment references and commentary to Human Resources personnel only. The "policy" cited by HR and Legal was fabricated to justify Hackling's conduct.

56. Upon information and belief, employees and hiring managers declined to participate in the investigation due to fear of retaliation by Nexstar. This chilling effect demonstrates the extent of Nexstar's failure to maintain a workplace free from discrimination and intimidation.

57. Despite corroborating information from Agent Koles confirming what was reported, and documented inconsistencies between Hackling's statements and Plaintiff's performance record, Nexstar HR concluded there was "no wrongdoing." This conclusion was predetermined and designed to shield Hackling from accountability.

**I. Nexstar Hears the Evidence and Fails to Provide Adequate Resolution (November 2025)**

58. In November 2025, Nexstar's Legal Department, through Terry Bush, was provided portions of the audio recording of Defendant Hackling's statements about Plaintiff.

59. The recording confirmed what had been reported by Agent Koles and the hiring managers. There could be no dispute about what Hackling said—Nexstar's own legal counsel heard the evidence directly.

60. Despite being confronted with audio evidence of Hackling's statements—statements that destroyed Plaintiff's career opportunities across multiple

markets—Nexstar offered only a nominal resolution that failed to address the substantial harm caused. The offer was wholly inadequate given the impact and discrimination Plaintiff suffered.

61. Nexstar's failure to provide appropriate remediation after hearing direct evidence of its employee's misconduct demonstrates the company's deliberate indifference to discrimination. By refusing to make Plaintiff whole despite knowing exactly what Hackling did, Nexstar made a calculated decision that protecting its manager was more important than addressing the harm inflicted on Plaintiff.

## J. Retaliatory Payroll Dispute (May 2025)

62. In May 2025, while the HR investigation was ongoing, Local HR Manager Linda Thomas informed Plaintiff that she allegedly owed Nexstar money for "overused vacation time."

63. Plaintiff requested a written accounting of the alleged overpayment. None was ever provided.

64. Plaintiff cited Nexstar's Employee Handbook, which specifies that vacation time deductions apply only to terminated employees—not to employees whose contracts expire, as Plaintiff's did.

65. When Plaintiff challenged the claim with reference to company policy, Nexstar immediately reversed its position and issued her full final paycheck on the last possible day.

66. The reversal proved the payroll dispute was baseless. Had Nexstar's position been legitimate, there would have been no basis for abandoning it upon challenge. The timing—during the pendency of Plaintiff's discrimination complaints—confirms its retaliatory purpose.

## K. The Devastating Impact of Defendants' Conduct

67. Defendant Hackling's campaign of defamation has devastated Plaintiff's career. After twenty-five years of building her reputation in broadcast media and news, Plaintiff now finds that her professional reputation has been damaged across multiple markets.

68. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer:

> a. Lost income from positions she would have obtained but for Hackling's statements;

> b. Lost career advancement opportunities in larger markets;

> c. Damage to her professional reputation across the broadcast industry;

> d. Diminished future earning capacity;

> e. Severe emotional distress, anxiety, humiliation, and mental anguish;

> f. Loss of the professional standing and career trajectory she developed over twenty-five years.

## COUNT I

### RACE DISCRIMINATION IN VIOLATION OF TITLE VII

(Against Defendant Nexstar Media Group, Inc.)

69. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

70. Defendant Nexstar is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

71. Defendant Nexstar, through its agent Defendant Hackling, discriminated against Plaintiff on the basis of her race (African American) by subjecting her to materially different and adverse treatment compared to similarly situated white employees.

72. Specifically, Blake Eason—a white male employee who had been the subject of an HR complaint—received favorable references, a facilitated transfer, and professional courtesies upon departure. Plaintiff—an African American woman with exemplary service and no disciplinary history—received negative statements to prospective employers, obstruction of all transfer requests, and no professional acknowledgment.

73. The only explanation for this stark disparity is race. Plaintiff and Eason held comparable positions, yet received diametrically opposite treatment based on race.

74. Defendant Nexstar's conduct was willful, intentional, and undertaken with malice or reckless indifference to Plaintiff's federally protected rights.

75. As a direct and proximate result of Defendant Nexstar's unlawful discrimination, Plaintiff has suffered and continues to suffer damages including lost wages, lost career opportunities, emotional distress, and reputational harm.

## COUNT II

## GENDER DISCRIMINATION AND HOSTILE WORK ENVIRONMENT

## IN VIOLATION OF TITLE VII

(Against Defendant Nexstar Media Group, Inc.)

76. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

77. Defendant Nexstar, through its agent Defendant Hackling, discriminated against Plaintiff on the basis of her sex (female) by subjecting her to different treatment than similarly situated male employees and by creating a hostile work environment.

78. Defendant Hackling, a male supervisor, abused his position of authority to pressure Plaintiff to disclose intimate details about a private medical procedure of a nature unique to women. No male employee would ever be placed in such a position. The inherently

gendered nature of the medical matter made Hackling's invasive demands a form of gender-based harassment.

79. Hackling's conduct was severe enough to alter the conditions of Plaintiff's employment and create a hostile and degrading work environment based on gender.

80. Plaintiff reported this conduct to Human Resources representative Mina Mayorga and provided documentary evidence, but Nexstar took no corrective action and refused to address the complaint—demonstrating deliberate indifference to gender-based harassment.

81. As a direct and proximate result of Defendant Nexstar's unlawful conduct, Plaintiff has suffered and continues to suffer damages including emotional distress, humiliation, and harm to her professional standing.

## COUNT III

### RETALIATION IN VIOLATION OF TITLE VII

(Against Defendant Nexstar Media Group, Inc.)

82. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

83. Plaintiff engaged in protected activity by complaining to Human Resources about Defendant Hackling's discriminatory conduct, including the medical privacy violation, the pattern of negative statements to prospective employers, and the disparate treatment compared to white employees.

84. Following Plaintiff's complaints, Defendant Nexstar took adverse employment actions against Plaintiff, including initiating a baseless payroll dispute during the pendency of the HR investigation and refusing to meaningfully investigate her complaints.

85. There was a direct causal connection between Plaintiff's protected activity and the adverse actions. The timing of the payroll dispute—occurring while Plaintiff was actively pursuing discrimination complaints—demonstrates retaliatory motive.

86. Defendant Nexstar's immediate abandonment of the payroll claim when challenged confirms it was pretextual and retaliatory.

## COUNT IV

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

(Against Defendants Nexstar Media Group, Inc. and Connor Hackling)

87. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

88. Section 1981 guarantees all persons the same right to make and enforce contracts as is enjoyed by white citizens. This includes the right to pursue employment opportunities free from racial discrimination.

89. Defendant Hackling intentionally discriminated against Plaintiff on the basis of her race by systematically destroying her ability to secure employment contracts with other broadcast stations through false and negative statements to prospective employers.

90. Defendant Nexstar is liable for Hackling's conduct and for its own failure to take corrective action after the discrimination was reported and documented. Nexstar conducted an investigation, found "no wrongdoing" despite the evidence, and thereby ratified Hackling's discriminatory conduct.

91. White employees, including Blake Eason, were not subjected to similar interference with their contract opportunities. They received favorable references and facilitated departures while Plaintiff's opportunities were systematically destroyed.

92. Defendants' conduct deprived Plaintiff of her right to make and enforce contracts on the same basis as white employees.

## COUNT V

### DEFAMATION PER SE

(Against Defendant Connor Hackling)

93. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

94. Defendant Hackling published false statements of fact concerning Plaintiff to third parties, including hiring managers at Atlanta Alive, FOX 5 Atlanta, stations in South Carolina and Alabama, and other prospective employers. As Hackling himself admitted on the audio recording, he received calls from other news directors as well, to whom he made similar statements.

95. On the audio recording, Hackling stated that Plaintiff "does her own thing" and that he "would not recommend hiring her." Through her agent, Plaintiff learned that hiring managers were told she was "lazy" and "toxic."

96. These characterizations were contradicted by Hackling's own written performance reviews, which documented Plaintiff as reliable, team-oriented, and productive.

97. These statements constitute defamation per se under Georgia law because they impute to Plaintiff characteristics that adversely affect her fitness for her profession and tend to injure her in her trade.

98. As a direct and proximate result of Hackling's defamation, Plaintiff has suffered damages including lost employment opportunities, damaged professional reputation, lost income, and severe emotional distress.

## COUNT VI

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

(Against Defendant Connor Hackling)

99. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

100. Plaintiff had existing and prospective business relationships with multiple broadcast stations that expressed interest in hiring her, including Atlanta Alive, FOX 5 Atlanta, stations in South Carolina and Alabama, and others.

101. Defendant Hackling had knowledge of these prospective business relationships, as hiring managers contacted him for reference information. As Hackling admitted on the audio recording, he received calls from other news directors as well.

102. Defendant Hackling intentionally interfered with these prospective business relationships by making negative statements about Plaintiff to hiring managers.

103. Hackling's interference was improper and unjustified. His statements were inconsistent with his own written performance reviews of Plaintiff and exceeded any legitimate business interest or qualified privilege.

104. As a direct and proximate result of Hackling's tortious interference, Plaintiff lost multiple employment opportunities and suffered substantial economic damages.

## COUNT VII

### INVASION OF PRIVACY – INTRUSION UPON SECLUSION

(Against Defendant Connor Hackling)

105. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

106. Plaintiff had a reasonable expectation of privacy in her medical information, including the nature of medical procedures and the identity of her treating physicians.

107. Defendant Hackling intentionally intruded upon Plaintiff's private medical information by demanding that she disclose her doctor's name, contact information, and specific details about a private medical procedure of an intimate and personal nature.

108. This intrusion would be highly offensive to a reasonable person. No legitimate business purpose justified Hackling's demand for such intimate medical details when Plaintiff had already provided a valid doctor's note.

109. As a direct and proximate result of Hackling's invasion of privacy, Plaintiff suffered emotional distress, humiliation, and mental anguish.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Crystal Whitman respectfully requests that this Court enter judgment in her favor and against Defendants, and award the following relief:

A. Compensatory damages for lost wages, lost future earning capacity, and lost employment opportunities in an amount to be proven at trial;

B. Compensatory damages for emotional distress, mental anguish, humiliation, and damage to professional reputation in an amount to be proven at trial;

C. Punitive damages against Defendants for their willful, malicious, and reckless conduct in an amount sufficient to punish and deter such conduct;

D. Pre-judgment and post-judgment interest as allowed by law;

E. Attorneys' fees and costs of suit, should Plaintiff retain counsel;

F. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

_[signature]_

Crystal Whitman, Pro Se

614 2nd Ave, Unit B

Columbus, GA 31901

Telephone: (318) 820-1087

Email: crystalwhitmantv@gmail.com

Dated: 12-11-2025, 2025

## VERIFICATION

I, Crystal Whitman, declare under penalty of perjury that I am the Plaintiff in this action, that I have read the foregoing Complaint, and that the facts stated therein are true and correct to the best of my knowledge, information, and belief.

_[signature]_

Crystal Whitman

Dated: 12-11-2025, 2025